Present:  Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and
          Agee, JJ., and Russell, S.J.

WILLIAM D. STOCKBRIDGE                    OPINION BY
                                  SENIOR JUSTICE CHARLES S. RUSSELL
v.  Record No. 041716                    April 22, 2005

GEMINI AIR CARGO, INC.

           FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
                   Hon. Burke F. McCahill, Judge

     This appeal involves an action by a stockholder and

former employee of a Delaware corporation to recover damages

for breach of the corporation's contract to repurchase his

shares.  The precise question before us is whether the trial

court erred in granting summary judgment in the corporation's

favor by relying on Section 160 of the Delaware General

Corporation Law, Del. Code Ann. Tit. 8, § 160(a) ("Section

160"), which prohibits the repurchase of a corporation's own

stock while its capital is impaired.  It is undisputed that

because the controversy involves the internal affairs of the

corporation, the laws of Delaware, the state of incorporation,

apply.

                    Facts and Proceedings

     Because the trial court granted summary judgment, the

facts will be summarized in the light most favorable to the

non-moving party, William D. Stockbridge.  Renner v. Stafford,

245 Va. 351, 353, 429 S.E.2d 218, 220 (1993).  Stockbridge is

a founder, former president and former chief executive officer

of Gemini Air Cargo, Inc. (Gemini), a Delaware corporation having its principal place of business in Virginia. Stockbridge served as chairman of Gemini's board of directors until March 29, 2002, when Gemini terminated his employment without cause.  He owned 10,376 shares of its voting common stock when this action was filed.  All the shares had been issued in 1999 at a par value of $503.11 per share.

Gemini had entered into a stockholder's agreement with Stockbridge and others when the shares were issued in 1999. The agreement provided, in pertinent part:

> In the event of a Termination Without Cause . . . for a period of sixty (60) days following the date of such Termination Without Cause, such Stockholder shall have the option to sell . . . to the Company all, but not less than all, of the Restricted Shares and Vested Options . . . held by such Stockholder . . .("Put Right"). The Put Right shall be exercised in each case by a written notice ("Put Notice") to the Company given in accordance with Section 8(f) of this Agreement on or prior to the last date on which the Put Right may be exercised by such Stockholder.

The agreement also provided that a stockholder's "Put Right" would "not be exercisable" if the board of directors determined, in good faith, that the repurchase of shares was "prohibited . . . by applicable law" or would constitute a breach of any loan agreement to which the corporation was a party or if "the Company is not otherwise able to obtain the consent of its senior lender to such repurchase."  The agreement termed these conditions "Repurchase Disabilities."

2

The agreement provided that any repurchase of shares pursuant to the "Put Right" was to take place within 60 days of the receipt of the "Put Notice" by Gemini, but that the time for performance would be extended pending receipt of any required governmental approval, pending determination of the "Put Purchase Price" or pending resolution of any "Repurchase Disability." Gemini was required to give the stockholder notice in writing if it determined that a "Repurchase Disability" existed and to send the stockholder a "Reinstatement Notice" as soon as practicable after the disability was removed.

On May 23, 2002, Stockbridge's counsel sent a letter to Gemini exercising his "Put Right" to sell his 10,376 shares to the corporation. Receiving no response, Stockbridge's counsel wrote again, on September 16, 2002, requesting a reply from Gemini and expressing his opinion that the stock had the value of $503.11 per share when he exercised his "Put Right." Again, Gemini made no response but referred the matter to Gregory S. Ledford, a member of its board of directors. On October 10, 2002, Stockbridge's counsel wrote to Gemini asserting a claim for $5,220,269.36, based on Stockbridge's valuation of his shares. Ledford responded, for Gemini, that the corporation did not agree with the valuation asserted by

Stockbridge but that it was "willing and will continue to cooperate with respect to determination of Fair Market Value."

Stockbridge's counsel wrote again to Ledford on December 11, 2002, on January 6, 2003 and on January 15, 2003, requesting that the determination of the fair market value of the stock be made by an independent appraiser, pursuant to the terms of the stockholder's agreement, and suggesting such an appraiser by name together with a statement of his qualifications. Ledford never responded in writing, but left a voice mail message for Stockbridge's counsel indicating agreement to the appraiser counsel had suggested. Gemini, however, never cooperated with the appraiser and refused to furnish him with the data needed for his evaluation of the stock.

Later, Gemini attempted to revoke its agreement to submit the valuation issue to the appraiser. Stockbridge brought this action on June 3, 2003, by motion for judgment to recover damages for breach of contract. After suit was filed, Gemini, for the first time, sent Stockbridge a "Disability Notice" pursuant to the stockholder's agreement asserting that the corporation was "under significant financial distress" and that "at all times since Mr. Stockbridge exercised his Put Right, the Company has been prohibited by the terms of the

4

senior credit facility from repurchasing any equity securities."

Gemini responded to the motion for judgment by filing a plea in bar, asserting that any repurchase of its stock would violate Section 160(a) and that it would also be prohibited by the terms of the stockholder's agreement because it would breach the terms of a loan agreement. The plea asserted that those conditions constituted a "Repurchase Disability" under the terms of the stockholder's agreement and that such a disability "precludes this action for specific performance of the Agreement."[*]

At a hearing on the plea in bar, Gemini called a single witness, its current chief operating officer, who testified that from the date of Stockbridge's "Put Notice" until the time of the hearing, Gemini's financial records showed a negative capital surplus. Gemini argued that this was dispositive of the case because of the effect of Section 160, which provides, in pertinent part:

> [N]o corporation shall . . . [p]urchase or redeem its own shares of capital stock . . . when the capital of the corporation is impaired or when such purchase or

---

[*] Stockbridge pointed out at the hearing on the plea in bar that he was not seeking specific performance of the agreement, but was seeking damages at law for its breach. Gemini abandoned its claim that the "repurchase disability" was a bar to Stockbridge's recovery and elected to proceed on the sole claim that Delaware law barred the action.

redemption would cause any impairment of the capital of the corporation.

The Supreme Court of Delaware has held that a repurchase impairs capital "if the funds used in the repurchase exceed the amount of the corporation's 'surplus,' defined...to mean the excess of net assets over the par value of the corporation's issued stock." Klang v. Smith's Food & Drug Ctrs. 702 A.2d 150, 153 (Del. 1997).

At the hearing on the plea in bar, Stockbridge conceded that the corporation's books showed a capital impairment but argued that the books did not tell the whole story. Relying on Klang, he pointed out that under Delaware law, "the books of a corporation do not necessarily reflect the current values of its assets and liabilities," id. at 154, and that he was entitled to try the issue of Gemini's true financial condition before a jury.

At the conclusion of the hearing, the trial court made a finding that "there was a negative capital surplus shown by the evidence" but requested briefs as to the legal conclusion to be drawn. After reviewing the briefs of counsel, the court, by letter opinion, overruled the plea in bar on the ground that it was essentially a plea of the general issue and that such pleas were abolished by our Rule 3:5. The case was

6

set for a jury trial and Gemini was directed to file its grounds of defense.

Gemini then filed a motion for summary judgment asserting the same grounds as those raised by its overruled plea in bar. At a hearing on the motion for summary judgment, Stockbridge pointed out that discovery had demonstrated bad faith on Gemini's part: Notwithstanding its claim that its capital was at all pertinent times impaired, it had allowed another former employee to exercise his "Put Right" five months after Stockbridge had given his "Put Notice," repurchasing that employee's stock at $503 per share, substantially the valuation Stockbridge claimed; Gemini had rewarded its officers with substantial bonuses in 2003; Gemini's board had never asserted any capital impairment until after suit was filed, but had instead offered to "continue to cooperate with respect to the determination of Fair Market Value."

Stockbridge also contended that Gemini had waived any defenses it might have had under Delaware law or under the stockholder's agreement by failing to raise them timely and, instead, pretending to consider his "Put Notice" for over a year. He pointed out that the minutes of Gemini's board showed no record of any consideration of his "Put Notice" at all and that Ledford, the director to whom the matter was referred, had testified that he could not recall any

discussion of "capital impairment" at any board meetings before suit was filed.

The court stated that it had made a finding "based on the evidence at the plea in bar hearing, that the Defendant had a negative capital surplus on May 23, 2002, which was the put date . . . and continuing up to the present. . . ." Relying on the applicable law of Delaware, the court equated that finding with a determination that Gemini's capital had been impaired. The court therefore held that "while the contract is not void it is presently unenforceable under §160 of the applicable Delaware Code" and granted Gemini's motion for summary judgment. We awarded Stockbridge this appeal.

*Analysis*

*A. Summary Judgment*

The trial court made a finding of fact at the hearing on the plea in bar that was based entirely on the state of affairs shown on the face of the corporation's books. The Delaware courts, in applying Section 160, have held that the books of a corporation may not accurately reflect its true financial condition. The Supreme Court of Delaware, in Klang, noted that unrealized appreciation or depreciation could readily render book numbers inaccurate. 702 A.2d at 154. Further, it is clear that an adverse party has the right to question whether the corporation's statement of its financial

condition was made in good faith.  An allegation of fraud or bad faith in a corporation's representations of its financial condition presents an issue of fact, not a question of law.

Gemini asserted in the trial court and on appeal that Stockbridge had conceded, in arguments before the trial court, that Gemini had a negative capital surplus.  The trial court observed, in ruling on the motion for summary judgment, that Stockbridge had made such a concession.  We do not so read the record.  Stockbridge indeed conceded that the corporation's books showed a negative capital surplus, but he at all times contended that the books were not a verity.  Stockbridge argued that the burden was on Gemini to prove, as an affirmative defense, that its capital was impaired and that he had a right to a jury trial on the issue.

Further, the court's reliance, in granting summary judgment based on its finding of fact made during the plea in bar hearing was inconsistent with its final ruling on the plea in bar.  The trial court overruled the plea in bar on the ground that it constituted nothing more than a plea of the general issue and that such pleas had been abolished by our Rule 3:5.  At common law, a plea of the general issue was a traverse, a general denial of the plaintiff's whole declaration or an attack upon some fact the plaintiff would be required to prove in order to prevail on the merits.  It had

the effect of challenging the plaintiff to go to trial and prove his case.  See Dudley v. Carter Red Ash Colliers Co., 125 Va. 701, 705, 100 S.E. 466, 467 (1919); Big Sandy & C.R. Co. v. Ball, 133 Va. 431, 437-38, 113 S.E. 722, 725 (1922); Kent Sinclair & Leigh B. Middleditch, Jr., Virginia Civil Procedure § 9.8 (4th ed. 2003).  Thus, after making its finding with respect to Gemini's financial condition at the hearing on the plea in bar, the trial court negated that finding by ruling, in effect, that Gemini's defenses were not properly raised by a plea in bar, but instead, were proper subjects for determination by a jury.

We have repeatedly held that summary judgment is a drastic remedy, available only where there are no material facts genuinely in dispute.  Smith v. Smith, 254 Va. 99, 103, 487 S.E.2d 212, 215 (1997); Slone v. General Motors Corp., 249 Va. 520, 522, 457 S.E.2d 51, 52 (1995).  It should not be used to short-circuit litigation by deciding disputed facts without permitting the parties to reach a trial on the merits. Renner, 245 Va. at 352, 429 S.E.2d at 219.  For these reasons, we conclude that the trial court erred in granting summary judgment.  Because the case must be remanded, we will discuss other issues that may affect further proceedings in the trial court.

*B. Corporation's Standing to Assert Section 160*

Stockbridge argues here, as he did in the trial court, that the Delaware Legislature never intended Section 160 to benefit corporations.  He points to the Delaware court's language in Klang:  "It is helpful to recall the purpose behind Section 160.  The General Assembly enacted the statute to prevent boards from draining corporations of assets to the detriment of creditors and the long-term health of the corporation."  702 A.2d at 154.  An authoritative treatise states flatly:  "The corporation itself cannot have the purchase declared illegal, in states where such a purchase is allowable under some conditions, even if injured shareholders or creditors might have that right."  6A William M. Fletcher, Cyclopedia of the Law of Private Corporations § 2861, at 477 (perm. ed. 1997 rev. vol.).  See also Askanase v. Fatjo, 130 F.3d 657, 675 (5th Cir. 1997) (refusing to find a violation of Delaware's § 160 even where a corporation's capital was impaired because to do so would not be within the statutory purpose); In re Reliable Mfg. Corp., 703 F.2d 996, 1001 (7th Cir. 1983) (the statute's underlying purpose should be considered in determining whether to apply it); Minnelusa Co. v. Andrikopoulos, 929 P.2d 1321, 1324 (Colo. 1996) ("the validity of a corporate stock repurchase may be attacked only by persons who are injured or prejudiced thereby and not by the corporation itself").

The foregoing authorities represent a clear majority view in jurisdictions applying Delaware's Section 160 or similar laws adopted by other states. Nevertheless, Gemini points out that the cited cases all address situations in which the repurchase of stock had been concluded and was sought to be undone at the behest of the corporation. Gemini argues that in the present case, the corporation is relying on Section 160 only in order to protect its directors from being compelled to do, or penalized for their failure to do, an unlawful act that would subject them to personal liability under Delaware law, specifically Section 174(a) of Title 8 of the Delaware Code Annotated.

Notwithstanding the persuasiveness of the authorities, we are unwilling to adopt an inflexible rule that a corporation may not in any circumstances assert Section 160, or similar laws, to avoid a stock repurchase while its capital is impaired. Directors have a fiduciary duty to manage the corporation's affairs with the utmost good faith in the best interests of all its shareholders and of the long-term health of the corporation itself. Whether they have done so in a particular case is a question of fact. We hold that Gemini may avail itself of Section 160 as an excuse for non-performance of its contract with Stockbridge if it carries its burden of proving, as an affirmative defense, that its capital

12

was impaired at all pertinent times. Gemini may not avail itself of this defense, however, if its capital impairment was procured by bad faith on the part of its directors, officers or agents, or if they acted in bad faith with respect to Stockbridge's "Put Right." The burden of proof on the issue of bad faith is on Stockbridge.

### C. Waiver

The defense that may be afforded by Section 160 is created by operation of law, is independent of the terms of the contract between the parties and cannot be waived. Gemini, however, also asserts defenses based upon the provisions of the stockholder's agreement: The "Repurchase Disabilities" which it invoked after Stockbridge had filed this suit. In its pleadings, Gemini relied on two such disabilities: (1) that the repurchase was "prohibited by applicable law" (Section 160) and (2) that it would constitute a breach of a loan agreement to which Gemini was a party. Either of these conditions, if proved, would have afforded Gemini an excuse for non-performance under the terms of the agreement.

Waiver arises from the intentional relinquishment of a known right. Virginia Tech. v. Interactive Return Service, Inc., 267 Va. 642, 651-52, 595 S.E.2d 1, 6 (2004). The "disability notice" given by Gemini to Stockbridge mentioned

13

only the second of its contract defenses, the effect of "the terms of the senior credit facility," presumably referring to a loan agreement. Thus its first contract defense, the effect of Section 160 purely as a contract defense, was waived by Gemini's failure to assert it as a "Repurchase Disability" pursuant to the terms of the stockholder's agreement.

Gemini also waived its contract defense that a repurchase would violate the terms of a loan agreement by its failure to make any timely assertion of it. The facts leading to this conclusion are undisputed.

Generally, corporate directors have an affirmative duty to become acquainted with the corporation's business so as to enable themselves to carry out their fiduciary obligations. 3 Fletcher, supra § 840, at 199. A failure to make reasonable inquiry or inadequate monitoring by a director may constitute a breach of duty. 3A Fletcher, supra § 1034.80, at 25. Thus, directors are presumed to have a reasonable degree of knowledge of the facts plainly appearing on the face of the corporate records. Id. § 1060, at 99.

Because the board of directors of a Delaware corporation has the legal responsibility to manage its business for the benefit of the corporation and its shareholders with "due care, good faith, and loyalty," Malone v. Brincat, 722 A.2d 5, 10 (Del. 1998), Gemini's board was at all times charged with

14

constructive knowledge of its general financial condition, including knowledge of the terms of any loan agreements to which the corporation was a party.  Its duty under the stockholder's agreement was either to repurchase Stockbridge's shares within 60 days of receipt of his "Put Notice" or, if the board determined in good faith that a repurchase disability existed, to give him a "Disability Notice" and thereafter to repurchase his stock "as soon as reasonably practicable after all Repurchase Disabilities cease[d] to exist."

Because the agreement provided no deadline for the issuance of a "Disability Notice," we interpret its provisions to require that such notice be issued within a reasonable time after the operative facts became known to the board.  When it received Stockbridge's "Put Notice," the board had constructive notice of the corporation's affairs and the terms of any loan agreements to which it was a party.  See Skouras v. Admiralty Enterprises, Inc., 386 A.2d 674, 682 (Del. Ch. 1978) (while a member of its board, a director is not only in a position to have first-hand knowledge of the corporation's transactions but also has a fiduciary duty to investigate its affairs).  The board was thus deemed to be immediately aware of any "Repurchase Disability" then existing.  It was then incumbent upon the board, under its fiduciary duty to the

15

corporation and all its stockholders, as well as to Stockbridge under the stockholder's agreement, within a reasonable time to give Stockbridge notice of any disability upon which it intended to rely.  Instead, Gemini lapsed into silence for five months and then, without asserting any "Repurchase Disability," offered to cooperate with Stockbridge in ascertaining the fair market value of his stock in order that the repurchase could proceed.  Later, Gemini, through its designated agent, agreed to the selection of an independent appraiser for that purpose but failed to perform that agreement and remained silent for another seven months until Stockbridge filed this action, when Gemini, for the first time, asserted a "Repurchase Disability."

Two elements are necessary to establish waiver: Knowledge of the facts basic to the exercise of the right and the intent to relinquish the right.  Virginia Tech, 267 Va. at 651-52, 595 S.E.2d at 6.  An implied waiver must be established by clear and convincing evidence.  Baumann v. Capozio, 269 Va. ___, ___, ___ S.E.2d ___, ___ (this day decided). Here, that standard is met.  Because of the board's constructive knowledge of the corporation's affairs, it had knowledge of the facts basic to the exercise of its right to invoke a "Repurchase Disability."  Because the board also had the fiduciary duty to act with fidelity to the interests of

the corporation and its stockholders, see  Malone, 722 A.2d at 7, 10-11, and failed to invoke a "Repurchase Disability" for their protection for over a year after receiving Stockbridge's "Put Notice," it will be presumed to have intended to relinquish its right to do so.  Accordingly, we hold that Gemini waived its contractual defenses under the stockholder's agreement.

*Conclusion*

For the foregoing reasons, we will reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

Reversed and remanded.